FORD <i>vs.</i> LUKENS.

| 81 | 633 |
| 87 | 544 |

A grantee of water privileges who by express stipulation is without right to dam up the water so as in any manner to overflow or injure a certain spring on the premises, cannot obstruct or affect it injuriously by erecting a dam or embankment across its outlet, and compressing' the water in its passage through the same within a narrow and confined channel, although at the date of the grant the spring was not flowing naturally, but had artificial works across the outlet, which retarded the flow. The owner not having covenanted to keep his spring in an artificial condition, could let it revert to its natural condition without subjecting it to be overflowed or otherwise injured by dams or obstructions thereafter erected. That he had obstructed it himself was no license to another to do it.

December 10, 1888.

Water and water-courses. Contracts. Torts. Before Judge FAIN. Whitfield superior court. April term, 1888.

Reported in the decision.

W. K. MOORE, for plaintiff in error.

McCUTCHEN & SHUMATE, *contra.*

BLECKLEY, Chief Justice.

Mrs. Lukens, the plaintiff below, derives her interest in the premises under Rowley. By a written contract between Rowley and Ford, made in July, 1883, Ford had the right to construct and maintain upon the premises one or more fish-ponds, and for that purpose to ditch, drain, etc., build dams, make embankments, stop or dam up the water, direct and change the course thereof as far as necessary, "but he shall not have the right to dam up the water so as in any wise to overflow or injure the main spring, which is the one used now by the said Rowley." The grant by Rowley was not a gratuitous license, but his compensation was to be one-third of the fish taken from the ponds, or he, his heirs and assigns were to have and own one-third of the ponds and all advantages derived therefrom. It seems that although Ford constructed five ponds before Mrs. Lukens acquired her rights in the property, he did not consider that these completed his system or exhausted the grant, but that he could go on and construct another. Accordingly, in 1886, without the consent and over the objection of Mrs. Lukens (or of her husband as representing her), he threw an embankment several feet thick across the spring branch close up to the spring, and through it made an escape for the water into his new fish-pond below by means of a wooden pipe or tube, nine by twelve inches, thereby compressing into that volume a current which had previously spread out some sixteen feet wide. Whether the effect of this was to raise the water in the spring higher than it was when the contract of 1883 was made, is not quite certain, but that it did cause mud to accumulate over the bottom of the spring and the water to be less clear and free from

impurity there is no doubt.   Moreover, the spring was injured by the new dam both in beauty and accessibility. The spring is a large one, discharging daily more than 1,000,000 gallons of water, the natural outlet being about sixteen feet wide.   For many years it has been walled up on three sides, and at the date of the contract there was also a wall extending across the outlet, constructed of open brick work so as to admit of a free escape or discharge of the water.   Before the dam now complained of was erected, this brick work had .wholly or partially fallen down, and some, if not all of the material had been removed from the channel

The suit was by Mrs. Lukens against Ford for constructing the embankment so near the spring, forcing the water to pass through the covered chute or tube, thus raising and ponding the water in the spring, injuring the water by forcing it to stand without running off in its natural way, marring the beauty of the spring, rendering it less accessible, etc.   The jury found for the plaintiff twenty dollars damages, and the case comes here by exceptions to the charge. of the court, and to its refusal to charge as requested.

The contention was and is, that the jury ought to construe the contract between Rowley and Ford and determine what the parties meant by the stipulation against overflowing or injuring the spring; or if not, that the court should construe it to mean that the condition of the spring at the date of the contract was alone to be regarded.   On the contrary, the court held and charged the jury that the words of the contract embraced the spring in its natural state, as it would flow without any artificial obstruction of any kind, and not as it was and flowed at the time of the contract and before.   We think both states are covered by the contract; that is, the spring was not to be injured as it then was

or it might become by reverting to its natural state. There was no covenant by the owner to keep it in any artificial condition, and without some express contract to that effect, the right to have and enjoy it in its natural condition would not be parted with or surrendered. Moreover, were the construction contended for the true one, the evidence would still have entitled the plaintiff to recover. To injure the spring in any way by means of damming water for the fish-ponds, though the height of water in the spring might not be raised, would violate the stipulation. Even to interfere by a dam with the accessibility of the spring would be injurious and therefore actionable. But to return to the question made, the spring was not to be injured at all by the use of the grant, whether it remained in its then condition or not. In whatever right and proper condition the grantee of the water privileges afterwards found it, he was to leave it. If he could erect dams from time to time, he had to adapt each new one to the spring as it then might be, if it was in its natural state or any state not worse for him than its natural. Had he desired to have it remain in a stationary condition, or be subject to injury if that condition was not maintained, he should have brought these terms into the contract and made them matter of covenant. But there was no contract whatever respecting how the spring was to be kept; that was left to implication, and surely the implication is broad enough if it restricts the owner of the spring to keeping in its natural state, or any state not less favorable to the other contracting party. When nature is made the standard in a scale of implied rights, there is not much danger of injustice to either party. The case of Carroll vs. Cockey, 3 H. & Johns. 282, cited in Ang. on Water-Courses, §276, deals with a contract in which the flow of water was the direct subject of the

stipulation, and holds that the means of supply as they existed at the time of contracting; no more and no less, were in the contemplation of the parties. No doubt that decision was correct. But if we are right in the foregoing views, there is a wide distinction between that case and the present.

Judgment affirmed.